IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 99-cv-148-RPM-BNB

JAMES RALPH DAWSON, JR.,

        Plaintiff,

v.

RONALD CARTER, and
RICHARD MISCHIARA,

        Defendants.

---

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

---

Plaintiff, through counsel, hereby submits this brief in opposition to the Defendants' Motion for Summary Judgement, and states as follows:

## I.    <u>STATEMENT OF THE CASE</u>

This is a civil action for compensatory damages against the Defendants for compensatory and punitive damages for the unconstitutional actions of Defendants.  This action arises under and is brought pursuant to 42 U.S.C. § 1983 and 1988 to remedy the deprivation by Defendants of Plaintiff's rights guaranteed by the First, Eighth and Fourteenth Amendments to the United States Constitution.

## II.    <u>STATEMENT OF FACTS</u>

This is in its most basic form a whistle blower case.  On May 3, 1998, Plaintiff ("Mr. Dawson") discovered that the Limon Correctional Facility prison librarian, Alice Harren, was being sexually harassed by Defendants Ronald Carter, Richard Mischiara and several other male department of corrections' employees. Attached as **Exhibit 1**, deposition of James Dawson, 65:4-

66:18. Having discovered this information, Mr. Dawson set out to help and protect Ms. Harren from the harassment she was enduring.  As a result of Mr. Dawson's whistle blower actions, the Defendants retaliated against Mr. Dawson.

When the law library was closed, Alice Harren would make copies for Mr. Dawson for civil rights' complaint that he had against another prison guard. **Exhibit 1**, 65:8-11.  One day, Ms. Harren told Mr. Dawson that she had recorded 17 different incidences of times when prison guards were calling and harassing her at her home.  **Exhibit 1**, 65:11-23.  Ms. Harren told Mr. Dawson that Defendants Carter[1] and Mischiara were amongst the persons calling and harassing her. **Exhibit 1**, 65:16-18.  Ms. Harren told Mr. Dawson that she kept changing her home phone number but the calls just continued. **Exhibit 1**, 65:13-14.  She could not figure out how they kept getting her number. **Exhibit 1**, 65:13-15.  Eventually, Mr. Dawson overheard Defendant Carter tell Defendant Mischiara that if he need any more information about Ms. Harren to let him know.  **Exhibit 1**, 65:20-23. Dawson assumed Carter, who had been the shift commander for the whole prison, had access to Ms. Harren's home phone number via her personnel files. **Exhibit 1**, 65:25-66:13.

On May 13, 1998, Mr. Dawson wrote to Patricia Ireland of the National Organization of Women to report the misconduct of the employees at the Limon Correctional Facility towards women. **Exhibit 1**, 66:19-67:12.  Mr. Dawson sent copies of this letter to his attorney at that time, Ms. Laura Flenniken, and to the Denver branch of the National Organization for Women. **Exhibit 1**, 67:13-18.  Mr. Dawson's letter to Patricia Ireland was returned to him unstapled and possibly read and/or copied. **Exhibit 1**, 67:20-24.  Mr. Dawson then wrote a letter to the Warden of the facility

---

[1]For the record, Defendant Ronald Carter has a history of harassing women.  A history that the Colorado Department of Corrections is well aware of. See attached as **Exhibit 2**, a compilation of records disclosed by Defendants during discovery re: Ronald Carter.

2

complaining that his mail had been tampered with.   **Exhibit 1**, 67:20-68:5, see also attached as **Exhibit 3**, letter.

On June 4, 1998, Al Estep contacted Mr. Dawson and informed him that the mail room had noticed the names of Limon Correctional Facility employees in the letter and it was the facility's policy to investigate such matters. **Exhibit 1**, 68:22-69:5.

On July 27, 1998, Richard A. Soares, the Warden at the Limon Correctional Facility, sent a letter to Mr. Dawson informing him that an investigation had been done of his allegations of sexual harassment by employees of the facility and that based on this investigation he had determined that Mr. Dawson's allegations were "frivolous and without merit." See attached as **Exhibit 4**, letter from Richard Soares to James Dobson (sic).  In this letter, the Warden threatened disciplinary action if further allegations were made by Mr. Dawson against staff members. **Exhibit 4**.

On August 9, 1998, less than two week after Warden Soares had sent his letter to Mr. Dawson, Defendant Ronald Carter telephoned Lieutenant Debbie Outen and had her move Mr. Dawson from a single cell in Unit I to a double cell in Unit II. **Exhibit 1**, 15:14-17:2.  At the time, Unit II was presented a life threatening problem for Mr. Dawson as the unit was on lock-down because of racial problems between black and Hispanic inmates. **Exhibit 1**, 14:22-15:11, 17:6-8, 18:16-20:7.  Predictably, Mr. Dawson had an altercation with a Hispanic inmate and the Mr. Dawson was placed in administrative segregation. **Exhibit 1**, 21:6-22:5, 29:1-19, 32:10-25.

On or about September 29, 1998, Mr. Dawson was removed from administrative segregation and placed into another life threatening situation.  Mr. Dawson was placed in a cell with inmate Mark Hall. **Exhibit 1**, 23:1, 27:5-12.  Mark Hall was the victim of an attempted murder case against Mr. Dawson in Arapahoe County District Court in April, 1988. **Exhibit 1**, 7:23-9:4.  The Defendants knew about the history between Mr. Dawson and inmate Hall. **Exhibit 1**, 23:6-26:19, 27:13-23.

3

According to Mr. Dawson, he suffered a pinched nerve in his right shoulder as a result of having to defend himself during this altercation with the Hispanic inmate on September 25, 1998. See attached as **Exhibit 5**, Sworn Affidavit of James Dawson; **Exhibit 1**, 32:10-14.  When Dawson was in the cell with Hall he suffered the following physical injuries:

> I did not sleep for approximately two weeks because I was afraid of being killed by Hall.  After several days without sleep, I started losing my senses. I lost my equilibrium.  Every time I ate, I bit holes in my tongue.  I bumped into the steel toilet, tables and chairs in the cell causing open sores on my shins, thighs, and ankles.  I fell down a flight of cement stairs and reinjured my right shoulder;  The injury to my shoulder has caused me extreme pain and emotional distress for the past 8 ½ years, and my thighs, legs, and ankles have permanent scars on them from bumping into the steel fixtures in the cell.  These injuries have caused me emotional distress for the past 8 ½ years. During the two weeks that I was forced to be in the cell with Mark Hall, I experienced extreme physical and emotional pain, and to date every time that I am reminded of the incident, I experience paranoia and emotional distress.

See **Exhibit 5**; **Exhibit 1**, 47:13-48:10, 70:9-71:8.

Two of Mr. Dawson's fellow inmates have signed sworn affidavits asserting that Mr. Dawson suffered physical injuries from bumping into things and falling down stairs during the time period he was forced to live in the same cell as inmate Hall. **Exhibit 6 and 7**.  Both of these inmates also testify that Defendants Carter and Mischiara knew about the problems between Mr. Dawson and inmate Hall. **Exhibit 6 and 7**.

On November 20, 1998, Mr. Dawson filed a Step I Grievance with regard to his having been intentionally placed in life threatening situations by staff members of the Limon Correctional Facility.[2]  On December 14, 1998, Mr. Dawson was notified by Al Estep that his grievance was denied.  Attached as **Exhibit 8**, is Mr. Dawson's Step I Grievance.

---

[2]The Step I Grievance describes two retaliatory moves, both of which are herein complained of.  In the Step I Grievance, Mr. Dawson mistakenly identified the date of the first retaliatory move as June 21, 1998.  Mr. Dawson corrected this error in Step II.

In denying Mr. Dawson's Step I Grievance, Al Estep addressed on the merits Mr. Dawson's complaint that he had been placed into a cell with Mr. Hall, writing, "No information was known to staff and there was nothing in your file to indicate a problem existed...". Mr. Estep went on to say that "No information on this issue was known to staff and there was nothing in your file to indicate a problem existed, nor did you bring it to anyone's attention."

On December 17, 1998, Mr. Dawson filed a Step II Grievance with regard to his having been intentionally place in life threatening situations by staff members of the Limon Correctional Facility. On December 23, 1998, Mr. Dawson was notified by Associate Warden Robert Taylor that his grievance was denied. Attached as **Exhibit 9**, is Mr. Dawson's Step II Grievance. In denying Mr. Dawson's Step II Grievance, Associate Warden Taylor merely referred to the denial written by Mr. Estep.

On December 30, 1998, Mr. Dawson exhausted the administrative process by filing a Step III Grievance, which was rejected by Frank Ruybalid, Step III Grievance Officer, on February 8, 1999. Attached as **Exhibit 10**, Mr. Dawson's Step III Grievance, and **Exhibit 11**, Mr. Ruybalid's Response to Mr. Dawson's Step III Grievance. The Response to Mr. Dawson's Step III Grievance was more than 25 days after Mr. Dawson filed his Step III Grievance.

The Colorado Department of Corrections Administrative Regulation 850-04, ("Grievance Procedure") dated October 1, 1998 (attached as **Exhibit 12**), establishes a three step grievance process "available to all offenders, which provides an open forum for their complaints..." Grievance Procedure 850-04(IV)(C)(4)(c)(3) requires "The Grievance Officer, within twenty-five (25) calendar days, will review, investigate, and respond to the grievance...". Grievance Procedure 850-04(IV)(C)(3) states that grievances "must be responded to within the time limits stated in this regulation...". Grievance Procedure 850-04(IV)(C)(3) explains that "[i]n the event the time limit

expires without a response, the offender may proceed to the next step." Mr. Dawson proceed to the next step by filing this lawsuit.

### III.    STANDARD OF REVIEW

Summary judgment is proper only if there is no genuine issue of material fact for determination, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Riley v. Brown & Root, Inc.*, 896 F.2d 474, 476 (10th Cir. 1990).  The party moving for summary judgment has " 'the burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party.' " *Brown v. Parker-Hannifin Corp.,* 746 F.2d 1407, 1411 (10th Cir.1984) (quoting *Adickes v. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)); *see also* 10 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2716, at 643 (1983).  The movant must demonstrate entitlement to summary judgment beyond a reasonable doubt, and summary judgment is inappropriate if an inference may be drawn from the facts by which the nonmovant might recover. *E.g., Brown,* 746 F.2d at 1411; *Mustang Fuel Corp. v. Youngstown Sheet and Tube Co.,* 516 F.2d 33, 36 (10th Cir.1975).

### IV.    ARGUMENT

**A.    Mr. Dawson exhausted his administrative remedies for his claims in this matter.**

It is undisputed that Mr. Dawson took advantage of the available three step grievance process in this matter.  During Step I of Mr. Dawson's Grievance filing, the prison clearly addressed the merits of Mr. Dawson's complaints and denied his grievance.  In doing so, the prison waived any right to claim that Mr. Dawson filed his grievance belatedly.  Additionally, once Mr. Dawson's Step III Grievance was not responded too within the time limit proscribed there was nothing else administratively Mr. Dawson could have done to remedy his claim besides filing suit in a court of

6

law.

During Step I and II of the grievance initiated by Mr. Dawson, the DOC addressed his complaints on their merits. In denying Mr. Dawson's Step I Grievance, Al Estep addressed on the merits Mr. Dawson's complaint that he had been placed into a cell with Mr. Hall, writing, "No information was known to staff and there was nothing in your file to indicate a problem existed...". **Exhibit 8.** Mr. Estep went on to say that "No information on this issue was known to staff and there was nothing in your file to indicate a problem existed, nor did you bring it to anyone's attention." **Exhibit 8.** In denying Mr. Dawson's Step II Grievance, Associate Warden Robert Taylor referred to the substantive denial on the merits written by Mr. Estep. **Exhibit 9.**

In *Jones v. Bock*, 127 S.Ct. 910 (2007), the United States Supreme Court clarified a number of issues regarding the Prison Litigation Reform Act (PLRA) and its exhaustion requirements. First of all, the Supreme Court held, "failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones v. Bock*, 127 S.Ct. at 921.

Secondly, the Supreme Court held that state prison inmates' § 1983 actions were not automatically rendered noncompliant with PLRA's administrative exhaustion requirement by fact that not all defendants named in complaints had been named in previous administrative grievances. *Jones v. Bock*, 127 S.Ct. at 922.

Finally, the Supreme Court abrogated part of the 10th Circuit's holding in *Ross v. Bernalillo*, 265 F.3d 1181 (10th Cir. 2004) by finding that a prison inmate's compliance with PLRA's administrative exhaustion requirement as to some, but not all, claims brought in a civil rights action does not warrant dismissal of entire action; rather, a court should proceed with exhausted claims. *Jones v. Bock*, 127 S.Ct. at 923.

7

The Supreme Court's holding in *Jones v. Bock* did not impact one of the exhaustion rules established in *Ross*,[3] "[i]f a prison accepts a belated filing, and considers it on the merits, that step makes the filing proper for purposes of state law and avoids exhaustion, default, and timeliness hurdles in federal court." *Ross*, 365 F.3d at 1186.  Thus, when the Al Estep considered the merits of Mr. Dawson's Step I Grievance he essentially waived any claim that Mr. Dawson had not filed the grievance in timely fashion.

In answering Mr. Dawson's grievances, the prison acknowledged that they believed that his grievance was not timely filed and that no response was necessary, yet they chose to answer the grievance on the merits nonetheless.

Finally, the Response to Mr. Dawson's Step III Grievance was more than 25 days after Mr. Dawson filed his Step III Grievance. **Exhibit 10.**  Grievance Procedure 850-04(IV)(C)(4)(c)(3) requires "The Grievance Officer, within twenty-five (25) calendar days, will review, investigate, and respond to the grievance...". **Exhibit 12**.  Grievance Procedure 850-04(IV)(C)(3) states that grievances "must be responded to within the time limits stated in this regulation...". **Exhibit 12**. Grievance Procedure 850-04(IV)(C)(3) explains that "[i]n the event the time limit expires without a response, the offender may proceed to the next step." **Exhibit 12**.  The next step after Step III is to file a lawsuit such as this one.  If Plaintiff is to be held to the time constraints contained within the Grievance Procedures certainly the Department of Corrections should also be held to these time limits.  Thus, the Department of Corrections should be estopped from claiming that Mr. Dawson did

---

[3]*Ross* was decided after this Court originally dismissed this matter but prior to the 10th Circuit considering Plaintiff's appeal of this Court's original dismissal.  The 10th Circuit in considering Plaintiff's appeal wrote, "One question ... is whether the prison accepted it and adjudicated it on the merits, even though it was untimely.  If so, Mr. Dawson would be deemed to have properly exhausted his remedies." *Dawson v. Taylor*, 128 Fed.Appx. 677, 678 (10th Cir. 2005).

not exhaust his administrative remedies. The DOC's very own procedures allow Mr. Dawson to "proceed to the next step" when the time limit for responding to a grievance passes.

As the Supreme Court recently noted, "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 127 S.Ct. at 923. As defined by the DOC, Mr. Dawson had exhausted his remedies when the DOC failed to respond within the time allotted by their own grievance procedures to his Step III grievance.

Mr. Dawson clearly used the same grievance to complain of two different retaliatory moves: (1) Defendants Carter and Mischiara had Mr. Dawson transferred from Unit I to Unit II; and (2) Defendants Carter and Mischiara had Mr. Dawson moved into a cell with Mr. Hall. Mr. Dawson exhausted his remedies for both retaliatory moves.

The DOC waived its right to claim Plaintiff had not filed his grievance on these two retaliatory moves in a timely fashion when it responded to the merits of Plaintiff's claim. And, even so, Plaintiff exhausted his administrated remedies as required by the PLRA and thus should be allowed to proceed with his claims in this Court.

**B.      Mr. Dawson suffered various physical injuries as a result of Defendants' actions.**

Under PLRA, Mr. Dawson's claims for mental and/or emotional injuries require a showing of physical injury. 42 U.S.C. § 1997e(e). According to case law, "[this] threshold may not be particularly high." *Clifton v. Eubank*, 418 F.Supp.2d 1243, 1245 (D.Colo. 2006); *see Mitchell v. Horn*, 318 F.3d 523, 536 (3rd Cir.2003) (surveying the authorities and finding "the courts of appeals have read 1997e(e) to require a less-than-significant-but-more-than-de minimis physical injury as a predicate to allowing the successful pleading of an emotional injury."); *Oliver v. Keller,* 289 F.3d

9

623, 627 (9th Cir.2002) ("for all claims to which it applies, 42 U.S.C. § 1997e(e) requires a prior showing of physical injury that need not be significant but must be more than de minimis"); *Harris v. Garner,* 190 F.3d 1279, 1286 (11th Cir.1999) ("the physical injury must be more than de minimis, but need not be significant"); *Liner v. Goord,* 196 F.3d 132, 135 (2d Cir.1999) ("physical injury required by § 1997e(e) must simply be more than de minimis"); *and Siglar v. Hightower,* 112 F.3d 191, 193 (5th Cir.1997)

The PLRA provides no statutory definition for the term "physical injury." 42 U.S.C. § 1997e *et seq.* Physical pain, standing alone, is a de minimis injury that may be characterized as a mental or emotional injury and, accordingly, fails to overcome the PLRA's bar; but, when paired with allegations of physical effects, physical pain may support a claim under the PLRA. *Mata v. Saiz,* 427 F.3d 745, 755 (10th Cir.2005); *Sealock v. Colorado,* 218 F.3d 1205, 1210 (10th Cir.2000). In making this determination, courts have looked to principles of tort law. *Zehner v. Trigg,* 952 F.Supp. 1318, 1322-1323 (S.D.Ind.1997), *aff'd,* 133 F.3d 459 (7th Cir.1997).

While a showing of physical injury may not be "de minimis," it need not be significant to survive the PLRA bar against claims for damages without a prior showing of physical injury. *See Mitchell v. Horn,* 318 F.3d 523, 536 (3rd Cir.2003). Allegations of physical pain when paired with allegations of more tangible physical effects meet the physical injury requirement. *Sealock v. Colorado,* 218 F.3d 1205, 1210 n. 6 (10th Cir.2000) ("assuming without deciding that physical pain constitutes 'mental or emotional injury' within the meaning of the [PLRA]," but holding that appellant satisfies the physical injury requirement with his prior showing of a heart attack). *See also Mata v. Saiz,* 427 F.3d 745, 755 (10th Cir.2005) (finding that prolonged chest pain, followed by a heart attack, formed the basis for a claim not for emotional injury, but for physical injury, and, thus, survived the PLRA bar).

According to Mr. Dawson, he suffered a pinched nerve in his right shoulder as a result of having to defend himself during this altercation with the Hispanic inmate on September 25, 1998. See **Exhibit 1**, 32:10-14; **Exhibit 5**. When Dawson was in the cell with Hall he suffered various physical injuries. See **Exhibit 1**, 47:13-48:10, 70:9-71:8; **Exhibit 5**.

Mr. Dawson clearly suffered pain as a result of Defendants actions, both in his resulting pinched nerve from the altercation with an Hispanic inmate and having fallen down stairs and bumped into objects repeatedly during his sleepless two weeks with inmate Hall. The pinched nerve in his shoulder is a tangible injury he suffered as a result of being placed into a unit that was experiencing tremendous racial tension. His re-injury of that pinched nerve falling down stairs while he was enduring a sleepless two weeks with an inmate who wanted to kill him is also a tangible physical injury. Also, Mr. Dawson asserts he has permanent scars on his thighs, legs, and ankles from bumping into the steel fixtures in the cell while he was forced to room with inmate Hall. **Exhibit 1**, 47:13-48:10, 70:9-71:8; **Exhibit 5**.

The physical pain Mr. Dawson endured as a result of both retaliatory moves when paired with the more tangible physical effects meet the physical injury requirement of the PLRA.

**C.      Mr. Dawson's claim for punitive damages against these Defendants was properly plead and supported by the evidence, and therefore, must survive this Motion for Summary Judgment.**

Mr. Dawson does not have to prove that he had any physical injury in order to recover punitive damages against Defendants Carter and Mischiara. "[P]unitive damages may be recovered for constitutional violations without a showing of compensable injury." *Searles v. Van Bebber,* 251 F.3d 869, 880 (10th Cir. 2001), *cert. denied,* 536 U.S. 904, 122 S.Ct. 2356, 153 L.Ed.2d 179 (2002) (Court specifically held that even though plaintiff prisoner could not recover for mental and

11

emotional injuries, because he had not suffered a physical injury, he could still recover punitive damages for violations of his constitutional rights.)  To obtain punitive damages under 42 U.S.C. § 1983, plaintiff must show that defendant's conduct was " 'motivated by evil motive or intent, or ... involve[d] reckless or callous indifference to the federally protected rights of others.'" *Id.* at 879 (quoting *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)); *see also Sanders v. Yeager*, 57 Fed.Appx. 381, 383, 2003 WL 221070, 2 (10th Cir. 2003).

The actions of Defendants Carter and Mischiara were most certainly motivated by evil motive or intent.  They were punishing Mr. Dawson because Dawson was blowing the whistle on their harassment of Alice Harren, the prison librarian.  Defendants Carter and Mischiara were responsible for putting Dawson into two life threatening situations in retaliation for Mr. Dawson's whistle blowing activities.  The harassment of Ms. Harren by these Defendants is reprehensible enough but on top of that they punished Mr. Dawson for standing up for Ms. Harren. See **Exhibit 1**, 65:8-69:5.

When considering the Defendants' Motion for Summary Judgment, the Court must consider the facts in a light most favorable to Mr. Dawson.  The facts alleged and supported with deposition testimony by Mr. Dawson clearly lay out behavior that shows malice towards both Mr. Dawson and Ms. Harren on the part of these Defendants.  These Defendants clearly had a reckless disregard and/or callous indifference to Mr. Dawson's federally protected rights.

## V.    CONCLUSION

Mr. Dawson exhausted his administrative remedies for his claims in this matter.  In Steps I and II of the Grievance Process, the DOC responded to the merits of Mr. Dawson's claims.  In Step III, the DOC failed to respond in a timely fashion which in accordance with the DOC's own regulations allowed Dawson to proceed to litigation.

Mr. Dawson suffered various physical injuries as a result of Defendants' actions.  Those

12

injuries are described consistently in detail in both his deposition and the attached affidavit. He suffered a great deal of pain and corresponding physical injuries, including a pinched nerve in his shoulder and scars on his legs as a result of the Defendants' actions.

With or without his claims for compensatory damages, Mr. Dawson's claim for punitive damages against these Defendants was properly plead and supported by the evidence, and therefore, must survive this Motion for Summary Judgment. These Defendants acted reprehensibly and the evidence of their behavior should be presented to a jury.

WHEREFORE, Plaintiff respectfully moves this Court to deny the Defendants' Motion for Summary Judgment.

Dated this 29th day of October, 2007.

Respectfully Submitted,

s/Michael J. Thomson
Patrick T. Murphy, #6968
Michael J. Thomson, #33592
PURVIS, GRAY & MURPHY, LLP
1050 Walnut Street, Suite 501
Boulder, Colorado 80302
Telephone (303) 442-3366
Fax (303) 440-3688
E-mail: mthomson@purvisgray.net
*ATTORNEYS FOR PLAINTIFF*

13

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of October, 2007, I electronically filed and served the foregoing pleading, **PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**, with the Clerk of the United States District Court for the District of Colorado through the CM/ECF Pacer system:

Edward T. Farry, Jr.
214 East Dale Street, Suite 210
Colorado Springs, CO 80903
mailing address:
P.O. Box 1177
Colorado Springs, CO 80901
efarry@farry.net
*Counsel for Defendants*


s/Brenda J. O'Brien
Brenda J. O'Brien
PURVIS, GRAY & MURPHY, LLP
bobrien@purvisgray.net

14