# Deposition
# of
# James Ralph Dawson, Jr.

≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈≈

*Dawson v. Taylor, et al.*

*United States District Court*
*District of Colorado*
*Civil Action No 99-M-148*

*Taken by Defendants*
*June 10, 2003*

Reported by:
Lori K. Stenstrom
Certified Shorthand Reporter

Transcript provided by:

*Javernick & Stenstrom, LLC*
*3131 South Vaughn Way, Suite 224, Aurora, Colorado 80014*
*720-449-0329 • FAX 720-449-0334*

EXHIBIT
1
tabbies

CERTIFIED COPY

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 99-M-148

_____

DEPOSITION OF JAMES RALPH DAWSON, JR.
June 10, 2003

_____

JAMES DAWSON,

Plaintiff,

v.

ROBERT TAYLOR, RONALD CARTER, DEBBIE OUTEN, RICHARD
MISCHIARA, and JOHN BOWKER,

Defendants.

_____


A P P E A R A N C E S

For the Plaintiff:    MICHAEL J. THOMSON, ESQ.
                      1050 Walnut Street
                      Suite 501
                      Boulder, Colorado   80302


For the Defendants:   GEORGE S. MEYER, ESQ.
                      Special Assistant Attorney General
                      4105 East Florida Avenue
                      Suite 300
                      Denver, Colorado   80222

2

Deposition of JAMES RALPH DAWSON, JR., the Plaintiff herein, called by the Defendants in the above-entitled matter on Tuesday, the 10th day of June, 2003, commencing at the hour of 10:06 a.m., at Limon Correctional Facility, Limon, Colorado, before Lori K. Stenstrom, Certified Shorthand Reporter and Notary Public in and for the State of Colorado, pursuant to Notice and the Federal Rules of Civil Procedure.

---

I N D E X

Page Number

Examination by Mr. Meyer                                          3

E X H I B I T S

Deposition Exhibit
Number                                          Initial Reference

A  Offender Grievance Form, Step I,                      14
   11/20/98

B  Offender Grievance Form,  Step II,                    14
   12/17/98

C  Limon Correctional Facility                           24
   Employee Incident Report Form
   3/23/95

D  Letter to Rick Soares from                            68
   James R. Dawson, Jr., 5/27/98

E  Letter to James Dobson (sic) from                     69
   Richard A. Soares, 7/27/98

3

PROCEEDINGS

JAMES RALPH DAWSON, JR., the Plaintiff herein, having been first duly sworn, was examined and testified on his oath as follows:

EXAMINATION

BY MR. MEYER:

Q   State your name, please.

A   James Ralph Dawson, Jr.

Q   And for the record, you are the Plaintiff in this proceeding?

A   Yes, sir.

Q   What is your date of birth, Mr. Dawson?

A   4/9/55.

Q   And you're currently incarcerated in the Limon Correctional Facility?

A   Yes.

Q   What are you incarcerated for?

A   Second-degree murder, attempted second-degree murder, and assault.

Q   Second-degree murder?

A   Uh-huh.

Q   Attempted second-degree murder?

A   Yes, sir.

Q   And assault?

A   Yes, sir.

4

Q   What years were you convicted for those crimes?

A   1992.

Q   Prior to this time, have you been incarcerated?

A   Yes, sir.

Q   When was that?

A   1982 to 1986, 1972 to '79.

Q   Why were you incarcerated in 1982 to '86?

A   Forgeries.

Q   Forgery?

A   Forgeries.

Q   Your voice is very soft and there's a machine going on.

A   Forgery and criminal impersonation.

Q   And 1972 to '79?

A   Burglary of a vending machine.

Q   Any other terms of incarceration?

A   No, sir.

Q   What is your parole eligibility date?

A   2033, something like that.

Q   What institutions in Colorado have you been incarcerated at?

A   Let me see, I've been to Shadow Mountain.

Q   And when was that?

5

A   Let me see, I think it was, like, '82, somewhere in there, '82 or '83.

Q   Okay.

A   In a medium security prison, Centennial Correctional Facility. I've been there twice. I was there in between that same span. Let me see, I've been here at Limon Correctional Facility. I think I've been to a camp too. I went to Rifle.

Q   I'm sorry, you went to?

A   I went to Rifle. Delta, I've been there also; and just recently, Buena Vista.

Q   When was that?

A   Let me see, I think it was like 2002, end of 2000 (sic), right before I got here. Right before I was returned here.

Q   And what was the occasion for you being transferred to Buena Vista?

A   It was a reclassification.

Q   You were reclassified from what to what?

A   I was reclassified from Centennial Correctional Facility to Buena Vista Correctional Facility.

Q   And what was the level of your classification?

A   I really don't know, Mr. Meyers (sic). They just said it was a reclass. I guess I went from what

6

would be closed security to medium.

Q   What is your current classification?

A   I think it's closed now.

Q   Do you know how long you've been so classified?

A   Pardon?

Q   How long have you been so classified?

A   For about a year.

Q   And before that what was your classification?

A   It was medium, I believe.

Q   Do you know why you were classified closed after being classified medium?

A   Yeah, my points went up.

Q   Why?

A   Because I got -- I got some reports for refusing to count.

Q   So you were convicted of a Code of Penal Discipline violation -- Code of Penal Discipline?

A   Yes, sir.

Q   And it was for refusing to count?

A   Yes, sir.

Q   What does that mean?

A   Well, you have to sit on your bed at a 90-degree angle, and I refused to do it. The main reason was because this situation that I'm in now, behind Mark

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado  80014  (720) 449-0329  FAX (720) 449-0334

**Page 7**

Hall, got a lot of friends at Buena Vista, and I kind of informed them of the situation, but they insisted I stay over there, so I kind of, like, pointed myself out.

Q    Let me see if I understand what you're saying.

A    Okay.

Q    At Buena Vista --

A    Buena Vista.

Q    -- Mark Hall had a lot of friends?

A    Yeah.

Q    Okay.

A    They call it the Black Hole Posse. It's a gang member group.

Q    And did you have any interaction with those friends of Mr. Hall?

A    No, I never got out of A and O, never got out of the receiving unit.

Q    So you never had any -- you were never subject to any threats or subject to any violence by those individuals, correct?

A    They never got a chance.

Q    But you were never touched or --

A    No.

Q    Who is Mark Hall?

A    He's a victim of an attempted murder case that was filed against me back in 1988.

**Page 8**

Q    Were you convicted of that attempted murder?

A    Yes, sir. It was dropped down to a Class 5 felony.

Q    Is that one of the violations for which you're currently incarcerated?

A    No, sir.

Q    Have you entered any plea bargains that have not resulted in your being incarcerated?

A    Any plea bargains? Yeah, the last one I had, my second-degree murder, was a trial.

Q    Was a trial?

A    Yes, sir.

Q    Okay. But have you been -- have you entered into any agreements that have not resulted in your being incarcerated?

A    Any agreements?

Q    Yes.

A    Well, I was incarcerated on that one. I got time served.

Q    How about the situation with Hall?

A    That's the one I'm talking about.

Q    Okay. That's what I'm trying to get at.

A    Okay.

Q    So there was a trial when you were convicted of attempted murder of Mark Hall, correct?

**Page 9**

A    No. What I was saying, I got convicted of Mark Hall. It was a plea agreement. They dropped it down to a Class 5 felony. I'm in here after having a trial. The case I'm in here on went to trial.

Q    Okay. So there was another individual that you attempted to have murdered?

A    No. This was a domestic violence case that I'm incarcerated on now.

Q    Domestic violence that resulted in a charge of attempted second-degree murder?

A    No. It was the second-degree murder.

Q    All right. What I'm trying to get at is, have you ever been incarcerated as the result of the attempted murder of Mr. Hall?

A    Yes.

Q    Why did you attempt to murder Mr. Hall?

A    Mr. Hall tried to rob me, and it was a dope deal gone bad.

Q    Now, you have sued a number of individuals in this case. Sort of as a preliminary matter, let me kind of go through --

A    Okay.

Q    -- and see what you claim about the incident.

A    Okay.

Q    First of all, Robert Taylor, what did he do

**Page 10**

that you are complaining about in this case?

A    Well, Robert Taylor conspired with other Defendants -- Ronald Carter, Richard Mischiara, Debbie Outen, and John Bowker -- to deny me of my right to petition for a grievance. He removed the affidavit from Doug Thames from my Step II grievance to try to cover up what was going on at the facility.

Q    What did that grievance concern?

A    It concerned the actions of Captain Carter tearing up grievances of inmates and retaliating against them for reporting their misconduct.

Q    And Mr. Taylor tore up an affidavit by Mr. Doug Thames?

A    No. He removed the affidavit from my grievance.

Q    How do you know that?

A    Well, because when I got the answer back, it wasn't there. I couldn't send it to the Step III grievance officer. And I asked my case manager what happened to it, and he told me that Taylor removed it.

Q    What did the affidavit deal with?

A    It dealt with the fact that Carter had threatened him and told him not to bother his staff, because he had a lot of time, so he tore the grievance up.

4 (Pages 7 to 10)

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado 80014 (720) 449-0329 FAX (720) 449-0334

11

Q   So you have no direct knowledge that Mr. Taylor himself did anything to remove the affidavit of Mr. Thames; you were simply told that by somebody else, right?

A   No. I'm sure he did. Because it went to him, he answered the grievance, and he sent it back to me.

Q   "He" being who?

A   Taylor.

Q   Okay.

A   I had it hand delivered to Taylor by Kohanik (phonetic), the head case manager. It was stapled to my grievance, and I made it a point to ask them to make sure I received this affidavit back. I also stated that in the Step II grievance that the affidavit was attached for that purpose.

Q   So when you received the Step II grievance back, the affidavit was not there?

A   Yes, sir.

Q   And from that you conclude that Mr. Taylor removed the affidavit?

A   No, sir. I asked Kohanik what happened to it, and Kohanik told me he had to remove it, because he was the only one who had access to it.

Q   So going back to my original question, the only information you have about Mr. Taylor removing the

12

grievance is that provided to you by Mr. Kohanik?

A   Yes, sir.

Q   And what information do you have to support your allegation that he conspired with the other Defendants?

A   Well, it's obvious the affidavit -- he removed the affidavit from my grievance.

Q   Is that the totality of the evidence that you have against Mr. Taylor?

A   Yes, sir. And the answer to the grievance that nothing had happened. He filed nothing wrong -- let me see here. Yeah, that's his answer.

Q   So there are two things, if I understand you correctly: one, what Mr. Kohanik said, correct?

A   Well, the facts were basically the grievance wasn't there. It's not so much Mr. Kohanik said it one way or the another. The grievance was gone. I didn't have access to it anymore, and Mr. Taylor is the only one that had access to it after the date, so . . .

Q   Well, if I understand you correctly, you got the grievance back?

A   I received it back.

Q   Without the affidavit?

A   Without the affidavit.

Q   Okay. Mr. Kohanik told you that Mr. Taylor

13

was the only one that could have removed it?

A   Yes, sir.

Q   And you also think that the fact that the grievance was denied is evidence of a conspiracy?

A   Yes, sir. The part of this is the factual basis that he removed the grievance. Why would he remove the affidavit that was trying to prove my point about something that was occurring in the facility?

Q   And you said you were precluded from proceeding with a Step III grievance?

A   No. I sent the Step III grievance in and informed them that the affidavit had been removed.

Q   Okay. To whom did you send the Step III grievance?

A   I'm not sure. Who was -- well, it was a Step III grievance officer, I know that.

Q   Mr. Ruybalid?

A   Yes, sir.

Q   What was the result of that grievance?

A   It was denied also.

Q   Do you have a copy of the grievance?

A   I have a copy of the Step I and Step II. I don't have a copy of the Step III.

Q   May I see the Step I and Step II, please?

A   (The witness complied.)

14

MR. MEYER: What I'm going to do here is have these marked and give them back to your client, if you will then copy them for me.

(Deposition Exhibits A and B were marked for identification.)

Q   (By Mr. Meyer) These have been marked and will be made part of this deposition. I will return these copies to you, and if you would give copies to your attorney, we'll then provide them to the court reporter --

A   Uh-huh.

Q   -- and to me.

A   Okay.

Q   Would you identify Exhibit A, please.

A   This is my Step I grievance.

Q   Okay. And Exhibit B?

A   This is my Step II grievance.

Q   If I can have Exhibit A back. Exhibit A appears to deal with your complaint that you were moved from a single cell in Unit 1 to a double cell in Unit 2.

A   Yes, sir.

Q   Okay. You further complain that the pod to which you were removed was on lockdown because of a racial problem between blacks and Hispanic inmates?

A   Yes, sir.

5 (Pages 11 to 14)

15

Q   And you complained that you were removed to a life-threatening situation?

A   Yes, sir.

Q   What was life-threatening about the situation?

A   Well, they moved me in a pod where they were having racial tension. They went over there and found a bunch of knives before they moved me in that particular pod. They knew that there was racial tension in there, and they did it deliberately.

Q   Who are "they"?

A   Captain Carter, Debbie Outen.

Q   Okay.

A   And Richard Mischiara.

Q   How do you know that Captain Carter was responsible for moving you?

A   When they called me down to the operations office --

Q   Who are "they"?

A   Well, Debbie Outen called me down to the operations office.

Q   Okay.

A   She was looking at a move board. They have a big move board that tells you where everybody is at in that particular unit, okay? Unit 1 and Unit 2 are under the supervision of Carter, Captain Carter; and Debbie

16

Outen was the move sergeant, she and Lieutenant Mischiara. Lieutenant Mischiara was under Captain Carter's supervision for Unit 1. Debbie Outen was under Captain Carter's supervision for Unit 2.

When I went into the office, she was on the telephone talking, looking at the board. She said, Mr. Dawson, pack your stuff up. This was a Sunday morning. They don't make moves on Sunday morning. They move people Monday through Friday, working days, just like in the free world society. And I said -- I asked her, Why am I moving? She said, Just pack your stuff, don't ask me no questions. You're moving to Unit 2 in with Earl Reed.

So I got a little angry. I left, and I went outside the office, but I stood there until she got off the phone. I didn't want to interrupt her telephone conversation.

Q   Okay.

A   When she got off the phone, I came back in the office. She said, I told you to move. I'm going to call security if you don't pack your stuff and get moving. The telephone ringed again, and Sergeant Mackey (phonetic) answered the phone, and said, Here, it was Carter again. She got back on the phone. She talked to Carter. And she looked at me and said, Get out of the

17

office. This is a direct order. You've got move. I'm moving you to Unit 2.

Q   Okay.

A   So I left and went, got my stuff and got a cart and jetted out of there.

Q   And the conditions in Unit 2 were life-threatening because of racial tensions?

A   Yeah.

Q   And you said there were no racial tensions in Unit 1, correct?

A   No. I was -- the problem that exists, you can't lose your single cell status for no reason. They can't move you from a single cell to a double cell -- that's like punishment -- for no reason and to move me in a situation --

Q   Excuse me. What's the basis for your statement that they can't move you from one cell to another?

A   Well, not without a disciplinary report. It's a due process violation. This is liberty -- they create a liberty interest. They give you the single cells for staying out of trouble and obeying the rules and doing what you're supposed to do.

Q   What is the basis for your statement that it's a liberty interest to stay in a single cell?

18

A   Because they give you a liberty interest to have a single cell. By staying out of trouble that's a privilege you get. It's part of the COPD rules. I think it's 650-500.

Q   There's a distinction between a liberty interest and a privilege, isn't there?

A   Well, a liberty interest is a privilege that the State creates through their own regulations. They provide it for you.

Q   So you're claiming that somehow your due process rights were violated?

A   No, that's not what I allege in this particular lawsuit.

Q   Liberty interest would only pertain to the due process violation?

A   Yeah, but that's not -- that's not the claim I raised in my lawsuit. It's just the factual basis that I'm using to establish the fact that I shouldn't have been moved on a Sunday morning into a pod where racial tension had just occurred and they find a number of knives and blacks and Hispanics were in there about ready to kill each other. That was the whole purpose -- they had been on lockdown for maybe three -- three days.

Q   Okay.

A   If the problem wouldn't have been serious, I

6 (Pages 15 to 18)

**Page 19**

doubt they would have locked them down.

Q  Do you know what the problem was?

A  Yeah. It was racial tension between blacks and Hispanics.

Q  Okay.

A  They went in -- somebody dropped a kite in and said there were knives somewhere. They went in and searched the place; they found the knives.

Q  Who is "they"?

A  The security, LCM security.

Q  How do you know they found knives?

A  It was told me by one of the clerks in the office.

Q  Who was that?

A  Unit 1 clerk. I don't recall his name.

Q  Apart from being told by the clerk that there was knives found in the office, do you have any factual basis for making the statement there were knives found in Unit 2?

A  Yes. A couple of people went to the hole behind the knives being found, a couple of inmates.

Q  And you know the COPD violation for which they were placed in the hole?

A  Yeah.

Q  How?

**Page 20**

A  For having contraband.

Q  Do you know what the contraband was?

A  Knives.

Q  How do you know they were knives?

A  Well, I don't know, per se, but I'm pretty sure that they wouldn't have just locked them up to lock them up.

Q  So you have no personal knowledge that these individuals were placed in the hole because they had knives, correct?

A  I'm pretty sure they have a document. It's documented.

Q  The question is not whether you're sure. The question is whether you know. Do you have any direct knowledge?

A  No.

Q  Okay.

A  But it can be proven. I'll put it that way. They have records of it.

Q  Do you know the names of the individuals that were placed in the hole?

A  They have reports of it.

Q  Do you know the names of the individuals?

A  No. They have records of it. I could find out for you, if you want.

**Page 21**

Q  You might do that, and let your lawyer know and he'll let me know.

A  Okay.

Q  While you were -- how long were you in Unit 2?

A  About a year and a half, I think.

Q  During that time was your life threatened?

A  Well, I left -- I was in Unit 2 for -- for about three weeks, and I got into it with this Sebrinio (phonetic), another gang member from Southern California. I don't know his real name. His name is Spanky. And they moved me out of Unit 2, and they moved me in with Mark Hall. I stayed in Unit 1 for a while. So when I went back to Unit 2 -- I was in there about a year and a half -- there wasn't any problems then.

Q  Okay.

A  I wasn't around the same people.

Q  Okay. So you were in Unit 1 for about three weeks?

A  I was in the Unit --

Q  I'm sorry, excuse me.

A  -- 2 for about three weeks.

Q  My mistake. You were in Unit 2 about three weeks. Something happened. What happened?

A  I got in a fight.

Q  Okay. And as a result of that, were you

**Page 22**

convicted of a COPD violation?

A  Yes, for a fight.

Q  And as a result of that, were you placed in punitive segregation?

A  Yes, sir, for one day.

Q  One day?

A  Uh-huh.

Q  Did you lose any other privileges?

A  Yes.

Q  What were those? Excuse me.

A  The single cell; that's about it.

Q  So if I understand you correctly, when you were moved -- when you were moved from Unit 1 to Unit 2, you were placed in a single cell in Unit 2?

A  After I complained for about a week and a half.

Q  So the answer is, yes, you were placed in a single cell?

A  No. I was placed in a double cell.

Q  After you complained, you were placed in a single cell?

A  Yeah. I was in a single cell for about a week. I was in a double cell for about two weeks.

Q  So you get in this fight, placed in punitive segregation, and after that you go back to Unit 1?

7 (Pages 19 to 22)

23

A   Yeah. They put me in a cell with Mark Hall.

Q   How long were you in a cell with Mr. Hall?

A   I really don't recall, because I was in a pretty bad state. I hadn't been sleeping about 10 to 14 days -- it's about anywhere between 12 to 14 days.

Q   When you entered this facility, did you identify Mr. Hall as a custody issue?

A   I was here first. Mark Hall didn't get here until like '96. I had been in the facility about four years before he came here.

Q   Was Mr. Hall in the correctional system?

A   I really don't know if he was or not. He might have been somewhere.

Q   Okay. So the answer to the question whether you identified Mr. Hall as an enemy is, no, correct?

A   Well, he was -- when he got here he was in Unit 3. He was a permanent party in Unit 3. He wasn't in Unit 1.

Q   I understand.

A   No, no.

Q   You never identified him as --

A   He came up as an enemy, maybe, in 1995 when I informed Carter about how I got shot. I think it was 1995. Hold on. Let me see. I'll tell you, just a second. I think I know exactly -- I think it was --

24

yeah. It was on March the 23rd, 1995, I identified him as an enemy, but not the type that I felt that I would have problems with unless I was just in the immediate area with him.

Q   May I see that document, please.

A   (The witness complied.)

MR. MEYER: Let's mark this Exhibit C, using the same procedure. This is your document?

MR. THOMSON: Yeah.

(Deposition Exhibit C was marked for identification.)

Q   (By Mr. Meyer) Okay. If we can digress from Exhibit A. Would you identify what Exhibit C is?

A   That's the incident report regarding Eric Hike.

Q   All right. Now, does this deal in any way with Mr. Hall?

A   Yes, sir. They were part of the same gang called the Black Hole Posse. About three days after the incident happened with Hall and I on the streets, he shot me behind the same incident. I walked into a dope house, and he hit me once in the arm -- he shot at me five times. He hit me once in the arm, and I kind of turned and looked, and the second one hit me in the side of the face. And that was all behind Mark Hall.

25

Q   Okay. But it's true that Exhibit C does not identify Mr. Hall in any fashion, does it?

A   I don't know, but it's documented. It's documented in the police reports. You can go to Arapahoe County.

Q   Well, that means that Arapahoe County knows the relationship between Mr. Hike and Mr. Hall, but there's nothing in this document indicating that the Department of Corrections knew --

A   I informed all of them. I informed Carter. I informed Gaylord. I informed Lieutenant Day (phonetic). It's kind of ironic that after you tell them, they didn't put it down. They probably didn't think it was important, because at the time Hall wasn't at the facility, so . . .

Q   So are you now stating that before Mr. Hall arrived at this facility you identified him as an enemy?

A   They knew it, yeah.

Q   When did you do that?

A   On the day this document was taken. There's two more of these in the file. I think if you asked the intelligence officer, Smeltzer -- I think his office is right down the Hall -- there's two other documents on the same subject. And that was March the 23rd, 1995.

Q   When did you identify Mr. Hall as an enemy of

26

yours for the first time and to whom?

A   March the 23rd, 1995, to Captain Ronald Carter, Lieutenant Gaylord, and my case manager, Lieutenant Day.

Q   Did you do so in writing?

A   No, sir. They -- they came and got me when this guy, Eric -- they called him Boom Boom. When he arrived at the facility, they came and got me and asked me about the situation about him shooting me. They asked me why it happened, how it happened, the whole 9 yards. And they asked me did I have a problem with him? And just like I told him in the particular statement I made -- it's in writing too. Like I say, you can go next door. He has it over there.

I informed him of the same thing. I told him about Hike; that I didn't have, per se, a problem with him as long as I wasn't in the immediate area with him. But they moved him out of the facility anyway. I informed them about the same thing with Mark Hall also.

Q   It says in Exhibit A that on September 25th, 1998, you got into an altercation and was placed in administrative segregation.

A   Uh-huh.

Q   You've testified that was for one day?

A   Yeah. I think it was one day, might have been

8 (Pages 23 to 26)

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado  80014  (720) 449-0329  FAX (720) 449-0334

27

two days. I think it was just one, though.

Q   Okay. It goes on to state -- if you need to see this, I'll give you a chance to look at it.

A   Okay.

Q   You go on to state, on September 29th, you were taken out of administrative segregation, so it looks like it was closer to four days?

A   Okay. I might have been mistaken.

Q   And was again placed in a life-threatening situation when you were placed in a cell with Inmate Mark Hall?

A   Uh-huh.

Q   Okay. On September 29th, did you inform anybody that Mr. Hall constituted a threat to you?

A   Yes, sir. I informed Debbie Outen and Lieutenant Mischiara.

Q   During the time you stayed with Mr. Hall, did he make any threats against you?

A   Well, he told me when I first got in there that we couldn't live in the same cell because -- I took that for what it meant.

Q   Couldn't live in the same cell?

A   Couldn't live in the same cell with him.

Q   Did he say anything else?

A   No, sir.

28

Q   Did he ever commit any acts of violence against you?

A   No, sir.

Q   And approximately 12, 14 days later you were moved out of the cell you occupied with Mr. Hall, correct?

A   Yeah. I kept complaining.

Q   I'm sorry?

A   I said, yes, after I kept complaining. I think he complained also.

Q   Where were you moved to?

A   I was moved to another cell inside Unit 1.

Q   Single or double?

A   Double.

Q   How long did you stay there?

A   I think I stayed there maybe about four months.

Q   After that where were you moved to?

A   Unit 2, I believe. I think I was moved back to 2.

Q   All right. When you were first moved to Unit 2, did you receive any threats?

A   From who?

Q   From anyone.

A   No, not per se.

29

Q   And when you say you got into an altercation with an Hispanic inmate, can you describe to me what that consisted of?

A   It was a argument about some cards.

Q   Cards?

A   Yeah. He got belligerent. I got belligerent. We got into a fight.

Q   Who threw the first punch?

A   He did.

Q   Where did this take place?

A   In somebody else's cell. I don't know. It was -- I can't recall, but it wasn't his cell and it wasn't my cell.

Q   It wasn't in a common area?

A   No.

Q   But before that fight, did he ever threaten you?

A   No. There was just a lot of racial tension in the area.

Q   At any time while you were in Unit 2 did anybody threaten your life?

A   No.

Q   And you state you were moved from Unit 1 into Unit 2 in retaliation by Captain Carter for filing a lawsuit against LCF staff?

30

A   Yes, sir.

Q   Who was the subject of that lawsuit? Who were the defendants?

A   John Riley, Bill Denig -- it's spelled D-e-n-i-g -- Cheryl Nycz, N-Y-C-Z, and Irving Jacques (phonetic).

Q   Okay.

A   And also, I didn't put in that particular grievance, for reporting Captain Carter and Mischiara for sexually harassing the female staff in the institution.

Q   It's not in Exhibit A?

A   It's not in Exhibit A?

Q   Right.

A   I don't know. Let me see it. Well, you know something, this is -- there's more to this grievance. It says continued on the next page, so it's missing some parts.

Q   You would have that, would you not?

A   Somewhere. It should be somewhere. I think it should be a part of my original action, civil complaint.

Q   Part of the original action in this case?

A   Yes, sir. Let me see here. Yeah. Here it is right here. You might want to put this in. This was a joint lawsuit initially and Judge Schlatter, so -- I

9 (Pages 27 to 30)

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado  80014  (720) 449-0329  FAX (720) 449-0334

31

think it's -- I think it says the same thing about Captain Carter.

Q   Okay.  We'll deal with that in just minute.

A   Okay.

Q   For the moment I want to look at Exhibit A, and I do not see any complaint in Exhibit A about sexual harassment.

A   But all of it's not there.

Q   Okay.  Do you have the remainder of this?

A   I don't.  It's in the initial complaint.  I think it says here also, this started out as a joint complaint, civil lawsuit, and we went separate ways, but I think in the amended complaint it has it in there.

Q   I understand that.

A   It's probably part of this also, the -- Part A, the second page.

Q   That's what I'm looking for.

A   Okay.  I don't have it in my file right here. I'll look for it.

Q   Okay.  It states in the response to your complaint about being placed in a cell with Mr. Hall, that you had shared -- or excuse me -- lived in the same pod for a number of years; is that correct?

A   That's a lie.

Q   If you'll look at the date on Exhibit A, it

32

appears to be November 20th, 1998.

A   November 11th?  Oh, okay.  Okay.  I'm with you.  November 20th, 1998.

Q   Prior to filing Exhibit A, did you complain about being placed in the cell with Mr. Hall in writing?

A   No, I didn't think that was necessary.

Q   Prior to November 20th, 1998, were you removed from the cell with Mr. Hall?

A   Yes, sir.

Q   What damages are you claiming you suffered as a result of being moved to Unit 2 just in and of itself?

A   Well, getting into an altercation with the Hispanic inmate, I got a pinched nerve in my shoulder, and the psychological, mental anguish.

Q   I take it from your description of the altercation with the Hispanic inmate that you were playing cards with him before the altercation?

A   No, I wasn't playing cards with him.  I was playing cards with somebody else, and we got into an argument.

Q   What was the argument about?

A   I don't really recall.  It was something that didn't have anything to do with him; and he got involved in it.  And we exchanged words, one thing led to the next.

33

Q   Okay.  Prior to that altercation, have you warned anyone in the facility that a particular inmate constituted a threat to you?

A   No.  I think what the problem is, is that the move to that particular area was in retaliation for filing lawsuits, because it was a hot area of the prison.

Q   Okay.  I understand.  Just stick to my question.

A   Oh, no, no.

Q   Did you have any altercations with any other Hispanic inmates during your stay at Unit 2?

A   No, no physical altercations.

Q   How about any verbal altercations?

A   All the time.

Q   And I believe you previously testified that none of those consisted of life-threatening threat to you, correct?

A   It could have.  I can't say life-threatening. It's not something you can say that it's like something tangible that you could put your hands on.  A guy just got stabbed in the neck yesterday -- a week ago from this deposition, for being an Asian.  He had no idea he was getting ready to get stabbed, but somebody said, Get all the Asians, so it's not something that you just put your hand on.

34

Q   What other instances or actions or statements by Hispanic inmates while you were in Unit 2 leads you to believe that you were in a life-threatening situation?

A   All the rumors about there's going to be some stuff about them and blacks, yahtays (phoneitc).  They don't say blacks.  They use the Spanish term yahtays. It's almost the equivalent of derogatory remarks for blacks.

Q   And if I understand you correctly, your move from Unit 1 to Unit 2 was an act of retaliation by Mr. Carter because you filed a lawsuit against some other DOC employees.  Is that what you're saying?

A   That, and the fact that I reported him to the National Organization for Women for sexually harassing several female employees.

Q   Did Ms. Outen retaliate against you for filing a lawsuit against other DOC employees?

A   She assisted.  She conspired with Carter.  She was the one that actually initiated the move.

Q   Well, there's a distinction between initiating a move and conspiring to retaliate, isn't there?

A   Pardon?

Q   There's a distinction between initiating the move and conspiring to retaliate, isn't there?

A   If it's in concert with their acting jointly

10 (Pages 31 to 34)

35

together, it's the same.

Q   Well, Mr. Carter --

A   It's the same motives. It's a question of motives.

Q   Well, Mr. Carter was Mr. Outen's supervisor?

A   Supervisor?

Q   Correct.

A   Sure.

Q   And Mr. Carter could have simply said, Move Dawson from Unit 1 to Unit 2, and she could have simply been following his orders, right?

A   Not necessarily. If you tell her what's going on, and she does it anyway -- if she moved me into one spot, you might be able to excuse her for the initial move to Unit 2, but I don't think that it would make any sense, because she knew she couldn't move me into a double cell anyway. And she knew that that particular · area just got off of lockdown, and that's where all the racial tension was.

So I think she reasonably should have had some idea what was going. It's not like she was stupid. If Carter would have told her to take her gun and go in there and shoot Mr. Dawson, I think she would know better. It's a prison environment. It's not a daycare center.

36

Q   So you're assuming that she knew something, correct?

A   Well, I'm assuming because -- well, not so much assume. I know, because you don't make moves, for one, on Sundays. That's not the policy in the prison. You move people from Monday through Friday. And you don't move a person out of a single cell into a double cell unless they've done something wrong.

Q   And from those two facts you're inferring that Ms. Outen conspired with Mr. Carter?

A   It's obvious, sir. You can ask anybody in DOC. It's obvious; that's not the way things work around here.

Q   Do you have any other facts upon which you're inferring that Ms. Outen had a conspiratorial motive?

A   30 years of experience in prison from Oklahoma to Colorado. And in this particular situation where I pretty much know how -- I know how the facility runs, who's in charge of what and how they do things. As a matter of fact, it's the DOC policy that they were acting outside of their authority, Carter and Outen. It doesn't work that way.

Q   You were incarcerated in Oklahoma?

A   Yes, sir. I told you that.

Q   That was part of the list?

37

A   From '72 -- yeah. It wasn't in Colorado. You might not have asked me that. You just asked me what time periods. From '72 to '79 it's Oklahoma.

Q   Yes. You did tell me the dates. You didn't tell me where.

A   Okay.

Q   All right. And was Mr. Taylor part of the same conspiracy?

A   I would think so. That he made himself a part of the conspiracy when he answered my Step II grievance and ignored everything that he was told.

Q   May I see your step -- Exhibit B, please.

A   (The witness complied.)

Q   Exhibit B appears to be dated December 17th, 1998, correct?

A   Yes, sir.

Q   And it indicates it was answered by Mr. Taylor on December 22nd, 1998, correct?

A   Yes, sir.

Q   And the moves of which you had complained took place -- if I may, Exhibit A, please.

A   Uh-huh.

Q   -- in September of 1998, correct?

A   Let me see.

Q   Sure.

38

A   Oh, yes, sir.

Q   Okay. So the moves take --

A   Okay. You know what?

Q   I'm sorry. Go ahead.

A   What happened was, I put the wrong dates in my Step I. I went and did an investigation, and I found out the moves were actually made on Sunday, August 9th. I corrected it.

Q   The moves were in August?

A   Yes, sir.

Q   Mr. Taylor answered your grievance in December?

A   Yes, sir.

Q   How does that prove that he was part of a conspiracy to move you in retaliation for your taking actions against other DOC employees?

A   Because retaliation is the act of chronological events. You can't take isolated events and say, This person is retaliating against me, because it would be kind of awkward. If the same people keep doing things to you, then you make a chronological list and say, I'm certain they're retaliating against me for certain acts. The chronology started in August. I didn't file a grievance until -- my Step I until actually November 20th.

11 (Pages 35 to 38)

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado  80014  (720) 449-0329  FAX (720) 449-0334

39

Q   Okay.

A   Okay. He answered my allegations of the chronological listings and said that nothing existed. And he also removed from my Step II grievance evidence that it had happened.

Q   Okay.

A   And it pretty much proves to me that he's a part of the conspiracy to retaliate.

Q   To remove you from Unit 1 to Unit 2?

A   No. The retaliation for filing a grievance. It's part -- it's not just a single, isolated incident. It's a series of acts.

Q   What acts of retaliation did you experience other than being moved from Unit 1 to Unit 2 and being placed in the cell with Mark Hall?

A   Well, first, I moved from 1 to 2, and then I got placed in the cell with Mr. Mark Hall.

Q   I understand. What were the other acts of retaliation that you were complaining --

A   Richard Mischiara stuck me in a segregation unit for being placed on RP status and left me in there nine days. I had ordered some commissary items that listed -- hygiene items. It was Scope, toothpaste, and athletes foot medicine, and sent it back, wouldn't let me have it.

40

Q   Let's leave Mischiara aside for a moment.

A   You asked what other acts.

Q   What other acts were you subject to retaliation by Defendants Taylor, Carter, and Outen?

A   Right. And Bowker.

Q   And Bowker?

A   Right.

Q   What are the acts of retaliation, other than what you described to me so far; moving you from Unit 1 to Unit 2, being placed in a cell with Mark Hall?

A   I was moved back to Unit 1 when I was placed in the cell with Mark Hall.

Q   I understand that. What other acts of retaliation did those four people engage in?

A   Sergeant Bowker kept moving me around and putting me in cells with kitchen workers. And he told his clerk that he didn't like the idea that I was filing lawsuits against his coworkers.

Q   To whom did he say that?

A   Michael Shaw (phonetic). That was the unit clerk at the time.

Q   Okay. Mr. Bowker kept moving you from cell to cell?

A   Yes, sir.

Q   Okay. In what unit?

41

A   Unit 2.

Q   And what harm did that cause you?

A   It didn't. It was just an inconvenience. It was just harassment. I was going to tell you Richard Mischiara also give me a false report.

Q   We'll get to Mr. Mischiara in just a moment. I want to do this one at a time.

A   Okay.

Q   In your complaint in this matter, your third amended complaint -- if you need to see that I'll show that to you.

A   I got it.

Q   Okay. On page 11.

A   Uh-huh. 11?

Q   You got it?

A   Huh-uh. Let me see yours.

Q   Paragraph 54, let me read you what I'm interested in first, and then I'll show it to you.

A   All right.

Q   You allege that on November 13th, 1998, Defendant Bowker moved Plaintiff from his cell in Unit 2 to a different cell within the same living unit in order to further harass Plaintiff for grievances and lawsuits which he had filed.

A   Okay.

42

Q   You can see that's underlined.

A   Uh-huh.

Q   Okay. Is that the same act that you have just described, that he moved you from cell to cell --

A   Yeah.

Q   -- to create an inconvenience and harass you?

A   Yes, sir.

Q   This indicates that there was one instance in which he did that?

A   No. There was a couple.

Q   You do not allege that in the complaint, do you?

A   No. I think I do.

Q   If you'll look at your third amended complaint, paragraph 54, it indicates there was one move.

A   Yeah, that's what it says, but he moved me a couple of times.

Q   On or -- before or after November 13th, 1998?

A   I don't know. Let me see. It was probably after. I can't say on the dates. He moved me about two times, two or three times. He just kept messing with me, giving me several reports, disciplinary reports, for no reason.

Q   It doesn't allege that in your complaint, does it?

12 (Pages 39 to 42)

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado  80014  (720) 449-0329  FAX (720) 449-0334

Page 43

A   No, it might not. But I have the records.

Q   Were you convicted of these reports?

A   Yeah.

Q   How many COPD violations have you been convicted of during your stay at the Department of Corrections in Colorado?

A   In the 12 years, from '93 to '9 -- no, '93 to 2001, I probably have about five.

Q   Okay.

A   And then I picked up about ten at the Buena Vista Correctional Facility just recently. About a total of 15. I averaged about one a year.

Q   Can you recall what those convictions consisted of?

A   I think I've had three fights and the rest of them is for -- let me see. Unauthorized possession; I think I got three of those for having somebody else's hot pot.

THE REPORTER:  For having what?

A   A hot pot, somebody else's hot pot.

Q   (By Mr. Meyer)  What's a hot pot?

A   It just heats up water. Let me see. Having gambling slips. Let me see. Okay. Refusing to count, that's all the rest of them. That was just recently.

Q   And that was at Buena Vista or here?

Page 44

A   Buena Vista. I got about ten of them, that's pretty much the bulk of them.

Q   And those were recent, you say?

A   Yes, sir. I didn't get in much trouble before.

Q   Let's talk about the fights. One of them was with an Hispanic inmate you previously described, correct?

A   Yes, sir.

Q   What were the other two?

A   One was with a guy that spit on me in the office shop.

Q   Where was that?

A   Here.

Q   Limon?

A   Yeah. Back in -- I'm trying to think, '9 -- probably in '96, maybe.

Q   Okay. And were you placed in punitive segregation for that?

A   Yes, sir, for ten days.

Q   Okay. And what was the other one?

A   I got one at Centennial, I think it was 2000. A guy threw some cleaning fluid on me.

Q   Okay. Were you placed in punitive segregation for that?

Page 45

A   Uh-huh, ten days. But you know something, I beat that.

Q   Found not guilty?

A   Found not guilty. They took me off punitive segregation.

Q   While you were awaiting the hearing?

A   Uh-huh.

Q   According to standard procedures?

A   Yes, sir.

Q   Now, you said that Mr. Bowker filed charges against you?

A   No. That wasn't related to Mr. Bowker -- oh, yeah, he did file charges against me. Yeah. I got some reports in here for tier visiting, being on the wrong tier, he alleges. I think I got like two of those from him.

Q   Okay. Were you convicted of those?

A   Yes, sir.

Q   And what happened as a result of those convictions?

A   I got probation.

Q   Did Mr. Bowker file any other charges against you?

A   No. Just a couple of those petty ones for cell visiting and being on the wrong tier. I think he

Page 46

filed two of them, and I got probation on each one of them.

Q   What else do you complain Mr. Bowker did?

A   Oh, that's it. Just harassment by moving me. Here's one of the reports he filed.

Q   Let me see that.

A   (The witness complied.)

Q   Thank you.

A   I thought I had another one. But I can't find it.

Q   Thank you.

Now, you state in your complaint that Mr. Bowker moved you from a cell in unit -- Living Unit 2 to a different cell within the same living unit in order to further harass you for the grievances and lawsuits he had filed.

A   That I had filed. That's probably a typo.

Q   No, that's correct, as stated it's correct, but it's you had filed?

A   Okay.

Q   What's the factual basis for your conclusion that he was retaliating against you by moving you from cell to cell?

A   Well, his clerk told me that's what he was doing. Michael Shaw was his clerk. He was -- he was a

13 (Pages 43 to 46)

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado  80014  (720) 449-0329  FAX (720) 449-0334

47

unit clerk.

Q  What did Mr. Shaw tell you?

A  That he was giving me a hard time because I had kept filing grievances and lawsuits on his coworkers.

Q  And how much -- how did Mr. Shaw know that?

A  I talked to him all the time. He was -- he was the Unit 2 clerk for maybe five, six years.

Q  Okay. Have we covered everything that you're complaining about --

A  Not really.

Q  -- because of the actions of everyone but Mr. Mischiara?

A  No. But when I was in the cell with Hall, I didn't go to sleep for about close to two weeks. I bit holes in my tongue. I had open sores on my leg from bumping into stuff. I fell down a flight of steps. I injured my shoulder again, and I was in a pretty bad way.

And for the past five years I've been in a situation with almost like all the different groups, all the, like, gang members. The ones at Buena Vista -- you've got the black guerrilla family here, you've got the Mexican Mafia, you've got the Aryan Brotherhood -- and it put me in a situation to where when Hall and I were in the cell together, it was almost like I condoned what he did to me as far as testifying against me, him

48

being an informant.

I just let that slide, but I was in, like, a situation between two evils. You know what I mean? I'm trying to get out of prison. I'm not trying to have any problems. But it put me in a situation where I'm constantly under fire behind that. And like I said, this is not a daycare center. The mental health in here is pretty bad. People trip on stuff every day. Somebody could just walk up and hit me in the head behind this stuff any day.

Q  Has anyone done that so far?

A  No. I'm not going to let them. I kind of watch myself pretty good.

Q  So you say placing you in a cell with Mr. Hall, you've been subjected to five years of a life-threatening situation?

A  Yeah, basically.

Q  And that's because you're perceived as having condoned Mr. Hall's testimony against you?

A  Yeah, informant.

Q  And you have identified various gangs by racial category?

A  That's the way they work.

Q  Aryan Brotherhood.

A  That's the way they work.

49

Q  Why would -- is there a connection between the racial composition and of these gangs and their perception that you condoned Mr. Hall's testimony?

A  Yeah. Well, it's like this, just recently a guy by the name of George Myers (phonetic) just came in and he testified in my case.

Q  Which case?

A  The case I'm in here on, the second-degree murder case.

Q  Okay.

A  And he kind of lied and blew things out of proportion. And it wasn't my position to try to hurt him because of this, because I'm black and he's white, but it is my position to inform the white guys of who he is. So the intelligence officer got ahold of the information also, and they moved him out of here, but they were getting ready to kill him about the same situation.

And it's the same situation with me and Mark Hall, that it's almost like tit for tat, when you see a Mexican that's done something wrong to somebody, when you see a white or black -- and this would be left on the black guerilla family in a situation like mine. I've had a lot of heat behind it, because I didn't do anything to him.

Q  So you were expected to do something against

50

Mr. Hall?

A  Yeah. And not have something done to me.

Q  Okay. What were you expected to do?

A  I don't have any idea. I guess I'm supposed to kill him. I doubt that will ever happen again.

Q  Okay. In your third amended complaint, you claim the Defendants' deliberate actions and omissions resulted in Plaintiff being subject to cruel and unusual punishment in violation of the protections guaranteed by the Eighth and Fourteenth Amendment to the United States Constitution.

Part of what we've talked about so far -- and leaving Mr. Mischiara for the moment -- what cruel and unusual punishments have you been subjected to?

A  I think the mental anguish and part of being put in the cell with Hall and subjected me to get hurt for the past five years states the Eighth Amendment claim. I know it would under Ramos. Judge Kane said it does, create a dangerous environment for somebody, that's automatically an Eighth Amendment violation.

Q  A dangerous environment in which you've been subject to no threats, right?

A  Per se, threats?

Q  Threats.

A  What -- well, you have to explain what

14 (Pages 47 to 50)

51

threats. Verbal threats on people?

Q  Yeah.

A  Not exactly.

Q  Okay.

A  Nobody came up and said they was going to kill me.

Q  And during the time you have not been subject to any physical altercations other than --

A  I got in the fight.

Q  -- the fight with the Hispanics? Okay. Let's talk about Mr. Mischiara. What did he do that you're complaining about?

A  Well, he stuck me in a disciplinary unit for no reason other than the fact that I had filed a lawsuit, and I got placed on restrictive privileges behind it. He denied me of my hygiene items for 30 days.

Q  Did he place you in a disciplinary unit for no reason?

A  No reason.

Q  There were no charges brought against you?

A  No charges brought against me.

Q  When was that?

A  July the 30th, 1997.

Q  What was his position at that time?

A  He was move sergeant for Unit 1.

52

Q  How long were you in the disciplinary unit?

A  Actually, I said 90 days on the complaint. I was in there about four or five months, but I just put a rough estimate of 90 days, because I believe he changed positions after about three or four months and went to somewhere else.

Q  Did Mr. Mischiara ever explain to you why you were placed in the disciplinary unit?

A  Yeah. He told me -- well, he didn't explain why he put me in the disciplinary unit, but he explained to me why he was sending my hygiene items back.

Q  Why was that?

A  He said because -- it had something to do with me filing a grievance. He said that's what I get for filing a grievance -- he said I should have thought about that before I went to filing lawsuits and grievances. I wanted my commissary. He said I couldn't have them, because I had been placed on RP status, which you can have your hygiene items on RP status.

Q  RP being restricted privileges?

A  Yeah.

Q  When were you placed on restrictied privileges?

A  July the 30th, 1997.

Q  The same time you were placed in the --

53

A  Segregation.

Q  -- segregation?

A  Uh-huh.

Q  Why were you placed on restricted privileges?

A  Because I filed a grievance against my -- the prison employer, a racial discrimination against my prison employer.

Q  Who was that?

A  John Riley.

Q  Were you given any written notification of why you were put on restrictive privileges?

A  Yes. They said it was because I missed programs like five years prior to that.

Q  Missed programs? What do you mean by that?

A  They said I didn't go to a mental health appointment. But that happened after I asked for the grievance to file on Riley.

Q  And you state that Mr. Mischiara filed a false disciplinary report against you?

A  Yeah. He claimed -- I was doing some voluntary work for B pod. They didn't have any porters, so I volunteered to clean up the entire -- the entire pod. And this one particular morning, I guess he made everybody mad on tier two of the disciplinary unit, and they went to throwing a lot of trash and a whole bunch of

54

garbage out on the floor.

So I guess he felt he was going to harass me. He called me down here; and he said, I know you just cleaned up, but go up there, and there's a bunch of trash on the top floor, go clean it up. I told him this was volunteer work; this wasn't something I had been assigned to do. And even my assignment was on the bottom tier. I wasn't allowed to go into the disciplinary unit. And he wrote me up for refusing to work.

Q  And you were found innocent of that charge, correct?

A  Yes, sir.

Q  In paragraph 49 of your complaint, you claim that Mr. Mischiara asked Defendant Outen to move Plaintiff from his single cell in Living Unit 1 to a double cell in Unit 2, where Defendant Mischiara knew racial tensions existed between black and Hispanic inmates as retaliation for Plaintiff having filed a civil rights complaint. Didn't you testify that it was Mr. Carter that told Ms. Outen?

A  This is the thing: Outen is the move sergeant over in Unit 2. Lieutenant Mischiara is under Carter's supervision as the living unit -- move sergeant for Living Unit 1. You can't move one without the other.

Q  Who asked Ms. Outen to move you, Mr. Carter or

15 (Pages 51 to 54)

55

Mr. Mischiara?

A   Carter. Mischiara had to approve it. He's the move sergeant for Unit 1. She's the move sergeant for Unit 2. They're both under Carter's supervision, but he, per se -- he told Debbie Outen to move me from 1, but she still had to get permission from Mischiara -- either inform him that she was doing it -- she couldn't just do it on her. I guess she could have. I don't really know.

Q   And you also claim that Mischiara eventually put you in another life-threatening situation when he, along with Defendant Carter and Defendant Outen, placed Plaintiff in a double cell with a person, Mark Hall, who had been the victim of an attempted murder charge against the Plaintiff. Mr. Mischiara was in Unit 2, correct?

A   1.

Q   Mr. Mischiara was in Unit 1?

A   Right.

Q   Where was Ms. Outen?

A   She was in Unit 2.

Q   How did Ms. Outen place you in a cell with Mr. Hall?

A   She was there when they came and got me out of the segregation unit after four days, because usually when you get in a fight, they leave you there at least ten days until you have your hearing. They came and got

56

me out, I mean, real fast. It was either like -- I guess I said in my grievance it was four days. And they all three were there. They made me go anyway. I told them before I went in, I told them after I was there, and I continued to complain to them.

Q   And you claim that Mr. Mischiara placed you in the cell with Mr. Hall in order to punish you for having filed a civil rights complaint. How do you know that?

A   Well, he told me the first time, and then -- that was the reason he wouldn't give me commissary. He had been harassing me all along about me filing lawsuits and grievances. He told me that was the reason he wasn't going to give me my hygiene items. And when he put me in the segregation unit, he just continually went from one thing to the next. Then he gave me a false disciplinary report. And it was pretty obvious what he was doing.

Q   In your complaint you state that -- if you need to see this, I'll be happy to show it to you -- on July 14th, 1997, Plaintiff filed a racial discrimination grievance against his prison employer. We already talked about that. On July 30th, you were placed on restricted privileges for filing a grievance.

A   Uh-huh.

Q   What do the restricted privileges entail?

A   You can't have -- you can't go to the rec yard

57

like everybody else; you have to go in the morning. You can't have a single cell. You can't have any food items. You can't have your TV or your radio.

Q   Hang on just a second. You can't have any food items?

A   No food items.

Q   You mean you're not able to eat?

A   Well, you can't get any commissary. You can go to the kitchen and eat, but you can't have any food items off the commissary. You can't have your TV, your radio.

Q   Okay.

A   What else? Let me think. TV, radio. Can't play any games. You can't have playing cards. Any of that sort of stuff. But they don't put you in segregation. Oh, yeah, also, you don't wear regular prison greens.

Q   What do you wear?

A   You have to wear orange pants. They kind of make you look like a clown. They put you in orange pants and a green shirt.

Q   All right. You further state that as part of this punishment, Defendant Richard Mischiara had Plaintiff placed in disciplinary for 90 days.

A   Yeah.

58

Q   Does that mean that somebody else actually placed you in the disciplinary unit?

A   No. He's the move sergeant, and he's the one that actually told me, Listen, you're moving in to B pod, Unit 1, and that's what it -- it's got a punch of bars. They don't classify it a lot of times as a disciplinary unit, but that's exactly what it is. You stay on lockdown all day.

Q   The disciplinary unit was in Unit 1, correct?

A   Yeah. 1, B pod, they use it as a regular disciplinary unit for the prison, and then use the other two tiers as, like, the new arrivals. When they come in, they've got an orientation period, seven-day lockdown.

Q   Okay.

A   And they were at the time using the rest of for, like, people they didn't like. They just chuck them in there and leave them locked down all day.

Q   And you state that -- it's your testimony Mr. Mischiara told you he was doing this because you filed grievances and lawsuits?

A   Yeah. He told me he wasn't giving me my hygiene items, because we had gotten commissary the same day, and I had not ordered any food items. All I had in there was toothpaste, some athletes food medicine, soap, deodorant, and he sent it all back to the commissary,

16 (Pages 55 to 58)

59

wouldn't let me have it. And it took me 30 days to put the money back on my account, so I could reorder it.

Q   Was your account balance in the black at the time you ordered these items?

A   No. I had -- let me see. I had about 13, $14, something like that. But it took about a month for them to put the money back in. Once they take it off, it's kind of like the stuff goes back to the commissary and . . .

Q   So if I understand the sequence here, you ordered the items?

A   Yes, sir.

Q   You paid 13, $14 for them?

A   Yes, sir.

Q   Mr. Mischiara refused to let you have them?

A   Yes, sir.

Q   You reordered them?

A   Yes, sir, when the money got back in.

Q   Which was about 30 days later?

A   Yes, sir.

Q   Did you receive them at that time?

A   Yes, sir.

Q   Apart from toothpaste and athletes foot medicine, what did Mr. Mischiara send back?

A   I had shampoo, soap, deodorant. Might have

60

even had some hair things sent back. I know it was all cosmetics, stuff I could have.

Q   Were you suffering from athletes foot at the time?

A   Yes, sir.

Q   How do you know it was Mr. Mischiara that denied you these particular items?

A   He was handing out the commissary.

Q   Is he a captain?

A   No, he's a lieutenant.

Q   Okay. So he's handing out the commissary?

A   Uh-huh.

Q   Going from cell to cell?

A   No. He goes -- just a line. It's like a room like this right here. He sits in there with an inmate with the sacks, and you come up to the door; and they tell you, Well, Dawson, 46709, and the inmate goes and grabs the bag and then you set it up on the counter.

Q   Okay. So you stood in line?

A   Uh-huh.

Q   Went up to the counter. And what did Mr. Mischiara say at that point?

A   He said, You're on restricted privileges, you can't have your commissary. I told him, Yes, I can. All I got in there is cosmetic items, just like everybody

61

else on restricted privileges. He said, You should have thought about that before you went and filed lawsuits and grievances. He said, I'm not giving it to you. He said, It's going back.

Q   Was there a bag there for you?

A   Uh-huh, yes, sir. It was plain. He had it in his hand. I was showing him that everything in there I was allowed to have. There was no contraband in there. There was several other guys that got commissary also that was in the same position, and he let them have theirs.

Q   Who is that?

A   Mr. Mischiara.

Q   No. Who was it that he allowed to have their commissary?

A   Let me see, Tony Holloway (phonetic). There was another guy. I can't think of his name. Oh, yeah, and a guy named Sphinx. I don't know how to pronounce it. It's S-P-I-N -- I don't know, Sphinx. Inmate Sphinx and Holloway.

Q   Was anybody present when Mr. Mischiara told you that he was denying you items because you filed lawsuits and grievances?

A   Yeah. A lot of people that I recall were there.

62

Q   Who was there?

A   Pardon me?

Q   Who was there?

A   I don't recall. There was a line of people. I was a little upset. I didn't even think about it.

Q   And Mr. Mischiara, in front of a line of people, a bunch of witnesses, told you he was denying you items because you filed lawsuits and grievances?

A   Yes, sir. You know what, it's even ironic -- let me see. Michael Coleman (phonetic) was the inmate, I believe, that was passing out the commissary, so he would probably remember. Yeah. The problem, Mr. Meyers, is they don't think -- they don't think that's a violation of your rights.

Q   You state that on September 2nd, 1997, you filed a civil rights complaint, Dawson versus Riley?

A   Yes, sir.

Q   That's the lawsuit we talked about?

A   Yes, sir.

Q   Okay. On October 30th, you returned to the regular prison population, but remained on restricted privilege status, correct?

A   Yes, sir.

Q   Paragraph 12, page 3.

A   Yeah.

17 (Pages 59 to 62)

63

Q   So that looks like you were in 90 days?

A   Right.

Q   If you look at paragraph 10, you were placed --

A   Okay. Yeah. From there to there, what's that -- July seventh -- yeah, about the tenth month. I thought I was in there longer.

Q   Ten months?

A   No. I said the tenth month is October. July is the seventh. That's a rough estimate. It's on or about. I don't really recall exactly, but I think I was actually in there a lot longer. I really couldn't get the dates from the move dates, because they wouldn't let me have them.

Q   Okay. Then it states you remained on restricted privilege status, correct?

A   Yes, sir.

Q   And it further states that you were finally removed from restricted privilege status on March 5th, 1998, as a direct result of a telephone conversation that occurred as part of your civil rights complaint.

A   Yeah.

Q   Tell me about that. What do you mean?

A   I think we had a scheduling conference and the attorney general that was representing the State at the

64

time -- it wasn't Grace Belsches. It was -- I don't know how you pronounce this. This guy here.

MR. THOMSON: Why don't you spell it for the court reporter.

(The witness showed the court reporter a document.)

Q   (By Mr. Meyer) Haughain, I think.

A   Haughain, okay.

Q   Okay. What did Mr. Haughain say?

A   I don't know. He made reference to investigating why I had been put on restricted privileges, and he would check into seeing about getting me off of restricted privileges at the conference.

Q   Okay.

A   But I had written him a letter back in April 23rd, yeah, April 23rd -- this has to be the wrong date then. I think that was -- I was just saying I was looking at the dates when I had wrote him about -- okay. This is about the further harassment. So it was him, yeah, because he was the one at the time. Because I wrote him right after that -- I think it was, like, maybe a month or so after that -- about Carter and Mischiara.

Q   Okay. So you were removed from restricted privileges as a result of the actions of -- or excuse me --

65

A   Scheduling conference.

Q   -- scheduling conference.

A   Yeah, Dawson versus Riley.

Q   Okay. You state on May 3rd, 1998, you discovered that the prison librarian Alice Harren was being sexually harassed by Defendant Mischiara.

A   Uh-huh.

Q   How did you discover that?

A   Well, she used to make copies for me when the law library was closed on this civil rights complaint against Riley. And she had told me that she had recorded 17 different incidences where the prison guards were calling her house. And she had kept changing her telephone number. She couldn't figure out how they were getting her telephone number.

So I asked her, I said, Who was the people calling your house and bugging you? And she told me Mischiara, Carter, some guy -- Captain Shiree (phonetic). Some guy named Captain Otter, had been bugging her about going out on a date. And about maybe a few weeks after that, I was standing in the corridor, and I heard Carter tell Mischiara if he needed any more information about Ms. Harren to let him know.

Q   Okay.

A   So apparently he was the one giving out the

66

telephone numbers of everybody. Carter had been the shift commander on -- for the whole prison. They would alternate back and forth. I think maybe one week out of the month he would be responsible for Living Units 1 and 2. And then the other week he would be responsible for the whole prison. So I guess that's the way he was doing that, he was going through the personnel files.

Q   You guess --

A   Well --

Q   -- but you don't know?

A   No. That's the only way he would have access to her number, the way he'd be able to tell Mischiara that he could get information.

Q   That's what you guess, correct?

A   Well, I guess he could have information on her just from being a captain. I don't know. You just have to find out where the information is, I guess, and then go from there.

Q   And you state that you wrote to Patricia Ireland on May 13th, 1998, at the National Organization for Women to report the misconduct of the employees of the Limon Correctional Facility towards women. Do you have a copy of that?

A   No. It's in the -- the prison has it. They kept my letter. The one that was returned, I think

18 (Pages 63 to 66)

67

somebody came and got it back from me. I don't have it. You know what I did with it, Mr. Meyers -- I just recalled. I think Laura Schwartz of David Lane's law firm has it; and the National Organization for Women has one. They got a copy of the letter here also.

Q   Okay. So you sent a copy of this letter to your attorney at that time, Ms. Laura Fle --

A   Schwartz.

Q   Schwartz. Who's Laura Flenniken?

A   Oh, Flenniken, is that her -- that's her married name. Yeah, okay. She's divorced now. She went back to the other. Flennikan, F-L-E-N-N-I-K-E-N.

What happened was that the address I sent -- I sent three letters out, because they had three different addresses down. They had the National Organization for Women in the state of Colorado, Denver, and they had -- they said this was the main office in Shawnee Mission, Kansas, but apparently it came back.

Q   Are you referring to a document?

A   Yeah. Well, this is my return -- return letter that the facility took. They opened it and unstapled it. And I wrote Soares and told him the only reason that letter would be unstapled is because somebody probably had to take a Xerox copy.

So after I wrote him -- after I wrote him a

68

letter, Al Estep came and told me that, because the mailroom noticed that it was the name -- Captain Carter's name was on it and several other employees, that they were obligated to do an investigation. And that's what they were doing, so . . .

Q   Okay.

A   Where is the letter? Here it is. Here's the letter that I wrote to Soares about that.

(Deposition Exhibit Number D was marked for identification.)

Q   (By Mr. Meyer) Would you identify what's been marked as Exhibit D, please.

A   Yes. This is my letter to the warden.

Q   Okay.

A   Informing him that I got my letter back, and it had been opened and copied.

Q   How do you know that?

A   Because when I sent it out, it was two pages long, and I had it stapled. And when it was returned to me -- it never reached its designation -- and it was unstapled.

Q   All right. Mr. Estep then contacted you and informed you that the names of Limon Correctional Facility employees were in the letter, and it was the facility's policy to investigate such matters; is that

69

correct?

A   Yes.

Q   Investigate such matters such as sexual harassment?

A   Yes, sir.

Q   And then Mr. Soares informed you that the investigation had been done of your allegations; and that based upon the investigation, he determined that your allegations were frivolous and without merit, correct?

A   Yes, sir.

Q   Do you have a copy of that letter?

A   Yes, sir, I do. He spelled my name wrong, Dobson, but he got my number right, though.

(Deposition Exhibit Number E was marked for identification.)

Q   (By Mr. Meyer) Now, this has been marked as Exhibit E, if you can identify that.

A   Yes, sir. That's my letter from the warden.

Q   Okay. There's also a handwritten Exhibit 7.

A   Yes, sir.

Q   What is that?

A   That's the part of my initial civil rights complaint.

Q   Okay. In this case?

A   In this case. Or it's either the exhibits I

70

sent to you, because I got a letter in here to you on -- I think it was on our scheduling order.

Q   Right.

A   I might have sent it.

Q   Okay.

A   But if you'll notice the date on this letter, this is when really all my problems started. I mean, my real problems. They kind of like just went crazy.

Q   What physical injuries have you suffered as a result of sensory deprivation?

A   Well, after about a couple days, I didn't -- they were still smoking cigarettes. I kind of like smoked myself to death. I lost my equilibrium. I kind of bit holes in my tongue every time I tried to eat something.

Q   Did you go to medical?

A   No. There was nothing they could do anyway.

Q   I'm sorry, wasn't?

A   There was nothing they could do anyway, so I never went to medical.

Q   Did you go to medical for any of the physical injuries you suffered as a result of the actions of the Defendants?

A   No, sir.

Q   What do you mean you were subject to sensory

Javernick & Stenstrom, LLC
3131 South Vaughn Way, Suite 224, Aurora, Colorado  80014  (720) 449-0329  FAX (720) 449-0334

71

deprivation?

A   It was like, you kind of like lose -- when you don't have any sleep, you kind of like -- you can't comprehend anything. You can't hear really good. You can't see real good. You bump into stuff. After about the fifth or six day, I had open sores on my shins from bumping into tables, stools, the toilet. I fell down a flight of steps, reinjured my arm.

Q   But for none of these you went to medical, right?

A   No. I'm going to tell you the reason why. I've been -- since November of last year, I was bleeding from my rectum, and I didn't have hemorrhoids. It took medical six months to take me to the hospital to check it out. That's pretty much the statement of affairs right now. You have to pay for everything and they don't do anything. It takes two or three weeks to get there, so I have bad experiences with the medical department. I'm suing the medical department right now.

Q   Is your suit against the medical department based on events that occurred before or after the events you're claiming of in this lawsuit?

A   Well, I'm complaining on medical since this prison opened. I filed a class action. It's been bad ever since, and so it's -- actually, it was from the

72

Ramos era. I filed under the same principles. It's been better since then. What sparked it was the -- recent like, I'd say from November of last year, probably in answer to your question, would be it wasn't directly because of what happened with me and Hall and none of these injuries I reported, but it's been bad since the facility opened, so I just got tired of it.

Q   You were transferred from the Limon Correctional Facility to Centennial Correctional Facility; is that correct?

A   Yes, sir.

Q   Were you given an explanation for that transfer?

A   Yes. They told me that -- I don't have it. I did give you a copy of that, where they said the reason that they transferred me was because I created a custody issue regarding their staff. It was almost like the staff could legally do what they were doing and it was my fault. Something to the effect I created a custody issue.

Q   Which staff?

A   Well, they didn't say, per se, staff, but the only person I had the problem with, Mark Hall, wasn't here. He got sent to CSP. He had been at CSP for a whole year. They moved him right after that.

73

Q   How long were you at Centennial?

A   Two years.

Q   And what classification at Centennial?

A   I think it was closed. All the way up till they moved me to Buena Vista.

Q   And you were classified as closed at the time?

A   No. I was -- well, when they moved me to Buena Vista, I signed a reclass. I was medium.

Q   At Centennial you were closed?

A   Yes, sir.

Q   Paragraph 32 of your third amended complaint, page 7, in the middle of the paragraph you say, Defendant Taylor conspired with Defendants Al Estep, Ron Carter, Richard Mischiara, and Debbie Outen. Mr. Estep is not a defendant in this matter, is he?

A   Where does it say Al Estep? No, he's not. He was a defendant in a -- yes, he was a defendant, but they dropped him. He was initially a defendant in this lawsuit.

Q   Who dropped him?

A   Zita Weinshienk. I believe she said that I didn't state a claim against him, because him lying was not really a stated constitutional violation. I didn't show participation, something to that effect. She dropped Al Estep as a defendant. I think it started as a

74

joint -- where is that caption? Yeah, right here. See where we started as joint defendants, Al Estep was.

Q   But he's not presently a defendant?

A   No, he's not. They dropped him from the lawsuit. That was a typo.

Q   Now, under your list of witnesses in the pretrial order, you say that the DOC employee Michelle Morrisey is expected to have information regarding being raped by Defendant Ronald Carter?

A   Uh-huh.

Q   How do you know she was raped by Ronald Carter?

A   Because he got suspended and I asked two or three of the officers when he got suspended, What happened to Captain Carter? And they said, He's on suspension for raping Morrisey.

Q   And what officer was that?

A   I can't -- I don't think I should say, per se. I might get in more trouble.

Q   Well, you're under an obligation to say.

A   Well, I don't really remember.

Q   You don't remember or you refuse to give the names?

A   Well, I really don't remember.

Q   Okay. And you say that she will have

20 (Pages 71 to 74)

75

information about you being retaliated against for reporting the crime to the National Organization for Women?

A   Yeah.  They investigated her too.  The inspector general, I think that's what they call him.

Q   Were you retaliated -- will she have information about you being retaliated against?

A   Well, I don't know.  She was my case manager for a while, so she might.  I don't know what she told the inspector general, so -- I wanted Marvin Gray in there, because Carter was the captain when he raped James Merving (phonetic), so -- but I don't know how that's going to show a pattern, because they kind of weasel out from under that.  It was actually he and Mischiara's fault that that happened.

Q   And under paragraph 3 of your witness list, you're talking about Laura Schwartz.  That's the individual who we talked about previously?

A   Yeah, she has the letter.

Q   And she will testify that the Defendants retaliated against you for his attempts to help Ms. Harren?

A   Yes, sir.  I was keeping her --

Q   How does show know that?

A   Well, at one particular time when Al Estep

76

came to talk to me about the letter he received and that they were investigating.  And he asked me -- I told him, Listen, I made contact with my attorney, and I'm kind of keeping everybody abreast, because doing prison litigation, you have to have somebody on the outside to kind of watch these people.  So I informed him.

As soon as I got up to go back to my pod, I went and got on the phone to inform her of what was going on about Alice Harren, because she was going to help Ms. Harren.  When I was on the phone, about 30 security ran down to the office.  There wasn't nobody back there but him and Carter.  They all ran back to the office and ran back to where I was at and looked at me while I was on the phone.

So he stopped them, and they just stood there and stared at me.  And I was telling Laura on the phone, I don't know what they're going to do, but it seems like they're getting ready to do something stupid.  She said, Well, just stay on the phone with me and see what happens.

And they sit there for a minute.  So I guess he told one of them to go check to see who I was talking to.  You know, they monitor the phone calls.  They checked, and when they found out I was talking to my attorney, they all just dispersed.  But I kept her

77

informed about everything that was going on.

Q   But apart from information from you, she would have no direct knowledge of you being retaliated against?

A   I think she might have talked to Alice Harren, so . . .

Q   Do you know that or you think that?

A   I'm not really sure.  I think that.

Q   You have in paragraph 12, DOC employees Lieutenant Burgman, Lieutenant Kisel, Lieutenant Lawless, Major Jim Day (phonetic), correctional facility -- excuse me, Sterling Correctional Facility, will give testimony they were aware of the conflict between the Plaintiff and Mark Hall, and the Defendants were also aware of the situation but still placed the Plaintiff in the cell with Mark Hall to retaliate against him.

Have you spoken to these individuals to see if they're going to say that --

A   Well --

Q   Wait a second.  Let me finish.  Let me finish my question.

A   Okay.

Q   -- they're going to say that the Defendants placed you in a cell with Mark Hall to retaliate against you?

A   You know what, Mr. Meyers, Mr. Kisel probably

78

will, unless his job is in jeopardy.  He might not.  But I know for a fact that when I told him how I got these bullets in my arm and the one that's resting under my brain, that it was behind Mark Hall.  And when I told them that they placed him in the cell, he said, You know Carter is just trying to get back at you for what you did to him and Mischiara.  And I said, Yeah, I know that.  I said, Now, if I call you as a witness, you're not going to act like you got amnesia and not remember anything.  He said, Yeah, I'll testify to that fact that you were in that cell with him when they should have knew better, because they knew.  They knew before they put me in there.

Q   Did you speak to Lieutenant Burgman about that?

A   Yeah.  I talked to all of them:  Kisel, Burgman, Lawless, and Major Day.  Major Day is over here.

Q   And they're all going to testify that the motivation for placing you in the cell with Mark Hall was to retaliate against you?

A   I don't see any reason why anyone would try to put me in there with him.

Q   No --

A   Yeah.

Q   -- that's not my question.  You know these

21 (Pages 75 to 78)

79

individuals are going to testify in that manner?

A   I know Kisel. Burgman will. Lawless probably will tell. Unless they threaten to take their jobs. The retaliation goes on and on. It's not just me.

(A discussion was held off the record.)

Q   (By Mr. Meyer) No further questions. Thank you.

A   Okay.

MR. THOMSON: Could I have just a minute?

MR. MEYER: Sure.

(A recess was taken from 12:06 p.m. until 12:15 p.m.)

MR. THOMSON: I don't have any questions.

(The deposition was concluded at 12:16 p.m., on Tuesday, June 10, 2003.)

80

I, JAMES RALPH DAWSON, JR., do hereby certify that I have read the above and foregoing deposition and that the above and foregoing transcript and accompanying correction sheets, if any, constitute a true and complete record of my testimony.

Amendment sheet(s) attached  [ ]

No changes, therefore no Amendment sheet attached  [ ]

_____
JAMES RALPH DAWSON, JR.

Subscribed and sworn to before me this _____ day of _____, 2003.

My commission expires _____

_____
Notary Public

_____

_____
Address

81

DEPOSITION OF
JAMES RALPH DAWSON, JR.

REPORTER'S CERTIFICATE

I, Lori K. Stenstrom, Certified Shorthand Reporter and Notary Public in and for the State of Colorado, do hereby certify that prior to the commencement of the examination the Witness was by me first duly sworn to testify the truth; that said deposition was taken in shorthand by me at the time and place hereinabove set forth and was thereafter reduced to typewritten form under my supervision, as per the foregoing transcript; that the same is a full, true, and correct transcription of my shorthand notes then and there taken.

I further certify that I am not related to, employed by, nor of counsel for any of the parties or attorneys herein, nor otherwise interested in the event of the within action.

My commission expires November 28, 2005; and I have hereunto set my hand June 23, 2003.

_____
Certified Shorthand Reporter
and
Notary Public

22 (Pages 79 to 81)